| UNITED STATES DISTRICT COURT | ECF |
| SOUTHERN DISTRICT OF NEW YORK | |

```
SILIPOS, INC.                              )
                                           )
          Plaintiff-Counter-Defendant,     )
                                           )   05 Civ. 4356 (RCC)
        - against -                        )
                                           )   MEMORANDUM &
PETER D. BICKEL,                           )   ORDER
                                           )
          Defendant-Counter-Claimant.      )
                                           )
```

**RICHARD CONWAY CASEY, United States District Judge:**

Defendant Peter D. Bickel ("Bickel") seeks a declaratory judgment voiding restrictive covenants in his contract with a former employer, plaintiff Silipos, Inc. ("Silipos"). Bickel's counterclaim presents two related questions under New York law: (1) whether a non-competition covenant that places a worldwide ban on a sales executive's ability to work in a particular industry for a year is enforceable, in whole or in part; and (2) whether a non-solicitation covenant that also bars this same executive from soliciting any of his former employer's current or prospective customers for a year is enforceable, in whole or in part. Bickel moved, by order to show cause, to preliminarily enjoin Silipos's enforcement of the covenants. The Court held a hearing on the matter on April 24, 2006. For the following reasons, the Court finds that the non-competition covenant is void in its entirety, but that the non-solicitation covenant is partially enforceable.

**I.    BACKGROUND**

Silipos is a manufacturer, distributor, and seller of gel products for health-care specialties, such as podiatry, orthopedics, and cosmetology. (Compl. ¶ 1.) Bickel was, until he tendered his resignation on January 11, 2006 (id. ¶ 23; Answer ¶ 1), the Executive Vice President of Silipos (Apr. 24, 2006 Hr'g Tr. ("Hr'g Tr.") at 41). Bickel began working at Silipos in 1992 when his father,

Silipos's founder, hired him. (Id. at 36.) Bickel's father sold Silipos to SSL Holdings ("SSL") in 1999. (Id. at 13.) SSL bought all of Silipos's stock for cash. (Id.) Bickel received $4.5 million for his shares. (Id.) In conjunction with SSL's purchase of the company, Bickel entered into two new agreements with Silipos ("1999 Agreements").[1]

One of the 1999 Agreements was the "Employment Agreement," which promoted Bickel to his current position of Executive Vice President and increased his annual salary from $140,000 to $200,000. (See Pl.'s Post-Hr'g Mem. Ex. A3 (Section 2(b)(I)).) The second of the 1999 Agreements was the "Noncompetition, Nonsolicitation and Confidentiality Agreement," which contains the two restrictive covenants at issue. Section 2(a) ("Non-Competition Covenant") chiefly prohibits Bickel from having any ownership interest or employment with anyone who is directly or indirectly involved in Silipos's industry anywhere in the world for one year following the termination of his employment.[2] Section 2(b) ("Non-Solicitation Covenant") primarily imposes an

---

[1] In 2004, SSL sold Silipos to Langer, Inc. ("Langer"), resulting in Silipos becoming a wholly-owned subsidiary of Langer. (Hr'g Tr. 42.) Bickel's 1999 agreements with Silipos remained in effect after this transaction.

[2] The Non-Competition Covenant states in relevant part:
During the Restricted Period, the Stockholder will not, directly or indirectly, engage in, or have any interest in any sole proprietorship, partnership, corporation, limited liability company or business or any other Person, whether as an employee, officer, director, partner, agent, lender, equity holder, consultant or otherwise, that directly or indirectly is engaged in, the Business of the Company in the Restricted Area or is a supplier of products manufactured by the Company or a commercial customer of such products . . . .
(Pl.'s Post-Hr'g Mem. Ex. B 2 (Section 2(a)).) The "Restricted Period" is defined as "one (1) year following the termination of the Stockholder's employment with the Purchaser." (Id. (Section 1(c)(B)).) The "Restricted Area" is defined as "the World." (Id. (Section 1(d)).) The "Business of the Company" is defined as:
. . . [T]he business of designing, manufacturing, selling, districting, promoting or maketing sterile and non-sterile products or devices that: (i) are products or devices offered for sale by the Company or under development by the Company prior to the

overlapping one-year restriction on Bickel's ability to solicit any of Silipos's current or prospective customers, distributors, suppliers, and vendors.[3]

The 1999 Agreements cemented Bickel's position as the highest sales executive at Silipos. (Hr'g Tr. at 39.) Bickel was responsible for oversight of a sales and marketing team (id. at 47, 50);

---

       date of this Agreement; (ii) are improvements to such products or devices; (iii) are equivalent in function or use to such products or devices or improvements; (iv) are range or product-line extensions of such products, devices or improvements or equivalents; or (v) use Gel as a therapeutic, comfort or barrier product or device applied on the skin.
(Id. 1 (Section 1(a)).)

[3] The Non-Solicitation Covenant states in relevant part:
During the Restricted Period, the Stockholder will not, directly or indirectly, solicit, employ, hire or attempt to do any of the foregoing, for the benefit of the Stockholder or on behalf of any sole proprietorship, partnership, corporation, limited liability company or business or any other Person (other than the Company) with respect to:
(i) any employee of the Company or any Person who was an employee of the Company at any time during the one-year period preceding the later of . . . the date of such solicitation, employment, hire or attempt to do any of the foregoing with respect to any employee of the Company;
(ii) any customer or distributor or prospective customer or distributor of the Company or any customer or distributor of the Company who was a customer or distributor or prospective customer or distributor at any time during the one-year period preceding the . . . the date of such solicitation, employment, hire or attempt to do any of the foregoing with respect to any customer or distributor or prospective customer or distributor of the Company, where such solicitation would, or would reasonably be expected to, adversely affect the Company's relationship or business with such Person
. . . .
(iii) any supplier or vendor or prospective supplier or vendor of the Company or any supplier or vendor of the Company who was a supplier or vendor or prospective supplier or vendor at any time during the one-year period preceding . . . the date of such solicitation, employment, hire or attempt to do any of the foregoing with respect to any supplier or vendor or prospective supplier or vendor of the Company, where such solicitation would, or would reasonably be expected to, adversely affect the Company's relationship or business with such Person.
. . . .
(Pl.'s Post-Hr'g Mem. Ex. B3 (Section 2(b)).) As with the Non-Competition Covenant, the "Restricted Period" is defined as "one (1) year following the termination of the Stockholder's employer with the Purchaser." (Id. at 2 (Section 1(c)(B)).)

he maintained varying degrees of direct contact with most of Silipos's customers, vendors, and distributors (id. at 37, 55-56); and he often negotiated special pricing arrangements with customers (id. at 54). Bickel also brought several customer to Silipos. (Id. at 21.)

Silipos alleges that Bickel's relationships with its customers is particularly significant in light of Silipos's role in the "niche business" that is the podiatric-gel industry. (Pl.'s Post-Hr'g Reply at 3.) Silipos's forty-five customers, vendors, and distributors are located throughout the world and represent many, if not all, of the potential customers in the industry. (Hr'g Tr. at 12.) These forty-five entities sell Silipos's products to individual practitioners worldwide. (Id.) Each of Silipos's competitors appears to sell products to the same forty-five entities. (Id.) Silipos alleges that, in such an interconnected industry, another competitor that employs Bickel could readily use his existing client relationships to Silipos's detriment. (Pl.'s Post-Hr'g Mem. at 14.)

Silipos also alleges that Bickel had access to confidential internal business information—i.e., pricing information, financial data (e.g., monthly sales reports), and future market strategies—as well as technical information about Silipos's current and upcoming products. (Id.) Under the terms of the 1999 Agreements, both parties designated these materials collectively as either confidential information or trade secrets. (Pl.'s Post-Hr'g Mem. Ex. B1 (Section 1(b)).) Silipos alleges that Bickel could convey this information to competitors, giving them an unfair advantage over Silipos. (Pl.'s Post-Hr'g Mem. at 16.)

Sometime between 1999 and 2006, Bickel's relationship with Silipos began to deteriorate. (Compl. ¶ 12.) Silipos claims that Bickel, among other things, "repeatedly told employees of Silipos that the company 'is not going anywhere,' . . . and that the employees should seek employment elsewhere." (Id. ¶ 13(a).) Bickel allegedly "engag[ed] in various side business ventures with

customers of Silipos for his own financial gain and to the detriment of Silipos." (Id. ¶ 13(i).) Bickel also allegedly revealed confidential information and trade secrets to people outside the company. (See, e.g., id. ¶ 15.) These events led to Bickel leaving Silipos in January 2006. Silipos does not allege that Bickel has violated these covenants since the termination of his employment.

After this fallout, however, Silipos initiated an action in state court, chiefly alleging that Bickel breached his employment contract by failing to use "best efforts" in the course of his employment. (See, e.g., id. ¶ 35.) Bickel's timely and proper notice of removal to the United States District Court for the Southern District of New York brings the case before this Court. Among his counterclaims, Bickel seeks a declaratory judgment voiding the restrictive covenants in his employment contract. Bickel has moved, by order to show cause, to preliminarily enjoin Silipos's enforcement of the covenants. Consistent with Rule 65(a)(2) of the Federal Rules of Civil Procedure, both parties agreed to limited, expedited discovery in order to consolidate a hearing on Bickel's motion with a trial on the merits of Bickel's counterclaim. Both parties waived a jury trial, and the Court held a hearing on April 24, 2006 to resolve the enforceability of the Non-Competition Covenant and Non-Solicitation Covenant.

## II. DISCUSSION

Under New York law,[4] restrictive covenants are subject to careful judicial scrutiny. Columbia Ribbon & Carbon Mfg. Co. v. A-1-A Corp., 369 N.E.2d 4, 6 (N.Y. 1977). This scrutiny

---

[4] Both parties agree that the contract is governed under New York law. (See Pl.'s Post-Hr'g Mem. Ex. B6 (Section 15: "This Agreement shall be governed and construed as to its validity, interpretation and effect by the laws of the United States of America and of the laws of the State of New York without regard to what other laws might apply under the governing principles of the contract or choice of law rules of New York or any other jurisdiction").)

5

follows from "powerful considerations of public policy which militate against sanctioning the loss of a man's livelihood . . . ." Purchasing Assocs., Inc. v. Weitz, 196 N.E.2d 245, 247 (N.Y. 1963). Thus, restrictive covenants must satisfy an "overriding requirement of reasonableness." Reed, Roberts Assocs., Inc. v. Strauman, 353 N.E.2d 590, 592 (N.Y. 1976).

In BDO Seidman v. Hirshberg, 712 N.E.2d 1220, 1223 (N.Y. 1999), the New York Court of Appeals held that specific enforcement of a restrictive covenant is appropriate only if the covenant is: (1) necessary to protect the employer's legitimate interests; (2) reasonable in time and area; (3) not unreasonably burdensome to the employee; and (4) not harmful to the general public. Further, an employer may assert only four types of "legitimate interests" under the first prong of the BDO Seidman standard: (1) protection of trade secrets; (2) protection of confidential customer information; (3) protection of an employer's client base; and (4) protection against irreparable harm where an employee's services are unique or extraordinary. 712 N.E.2d at 1224-25.

If an employer demonstrates at least one legitimate interest, a court has discretion to partially enforce an otherwise overbroad covenant—that is, a covenant which fails to satisfy other elements of the BDO Seidman standard—only "to the extent necessary to protect" the established legitimate interests. Scott, Stackrow & Co. v. Skavina, 780 N.Y.S.2d 675, 678 (N.Y. App. Div. 2004), appeal denied, 821 N.E.2d 972 (N.Y. 2004). An employer also must demonstrate good faith—"an absence of overreaching, coercive use of dominant bargaining power, or other anti-competitive misconduct"—to warrant the possibility of partial enforcement. BDO Seidman, 712 N.E.2d at 1226.

A.  The Non-Competition Covenant

1.  Legitimate Interests

Silipos asserts that the Non-Competition Covenant is supported by three of the possible four legitimate interests identified in BDO Seidman: protection of trade secrets, protection of confidential customer information, and protection of its client base.[5] The Court addresses each in turn to determine whether the claimed interest qualifies as a legitimate interest.

a.  Protection of Trade Secrets

A trade secret is "any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it." Ashland Mgmt. Inc. v. Janien, 624 N.E.2d 1007, 1013 (N.Y. 1993) (quoting Restatement (Second) of Torts § 757, cmt. b (1979)). With respect to restrictive covenants, however, New York courts have cautioned against overzealous application of this expansive definition. Thus, recognition of trade secrets in this context does not "encompass nearly all confidential business documents." Marietta Corp. v. Fairhurst, 754 N.Y.S.2d 62, 67 (N.Y. App. Div. 2003), modified on other grounds, 781 N.Y.S.2d 387 (N.Y. App. Div. 2004). Similarly, mere

---

[5] To varying degrees, both sides analyze Bickel's role as a salesman in terms of whether his abilities and client relationships make him unique. The Court declines to address these arguments, for the Court of Appeals in BDO Seidman recognized customer relations as a separate, cognizable legitimate interest. Compare BDO Seidman, 712 N.E.2d at 1224-25 (explaining the controversy behind recognizing customer relations as a legitimate interest), with Ticor Title Ins. Co. v. Cohen, 173 F.3d 63, 71-73 (2d Cir. 1999) (construing a "star" salesman's extensive client relationships as a sufficient basis for finding him "unique"). In addition to recognizing protection of a client base as a legitimate interest, the court in BDO Seidman also stated specific requirements for finding such an interest. 712 N.E.2d at 1225 (requiring long-standing client contact where the employee's services "are a significant part of the total transaction"). Therefore, the Court evaluates Bickel's role as a salesman only in light of these more specific requirements, not in terms of uniqueness.

"knowledge of the intricacies of a business operation" does not qualify. Catalogue Serv. of Westchester, Inc. v. Henry, 484 N.Y.S.2d 615, 616 (N.Y. App. Div. 1985).

The information Silipos claims as trade secrets is of four types: (1) business information, such as marketing sales reports and gross margin reports; (2) strategy information, such as future marketing plans; (3) technical information, such as the specifications of Silipos's upcoming products; and (4) pricing information. (See Pl.'s Post-Hr'g Mem. at 16; see also Pl.'s Post-Hr'g Reply at 3-4.) None of this information qualifies as trade secrets for purposes of the Non-Competition Covenant.

New York courts have routinely held that business or financial information, such as market reports, do not trigger the trade-secrets legitimate interest. See, e.g., H. Meer Dental Supply Co. v. Commisso, 702 N.Y.S.2d 463, 465 (N.Y. App. Div. 2000) (modifying an order that preliminarily enjoined defendants from using such information). Bickel's business knowledge only involves information of this sort. Therefore, Silipos lacks a trade-secrets legitimate interest in protecting its business information. Similarly, trade-secret protection does not extend to information regarding "market strategies," Marietta Corp., 754 N.Y.S.2d at 67, and the Court thus finds that Silipos lacks a legitimate interest in its strategy information as well.

The Court also finds that Bickel's technical knowledge is insufficiently specific to qualify as a trade secret. For example, Bickel does not have knowledge about the chemicals used in gel formulations. (Hr'g Tr. at 61.) And Bickel is not an engineer, so his lack of technical knowledge will prevent him from meaningfully informing others how to reverse engineer Silipos's upcoming products. (Id. at 62) As such, a prospective employer will not be able to use Bickel's knowledge to gain an unfair advantage over Silipos in product development.

8

Finally, Silipos argues that its pricing arrangements with individual customers constitute trade secrets. This information is important because price is "the most important element" in persuading a distributor to carry Silipos's products. (Pl.'s Post-Hr'g Reply at 3.) Silipos employs a "discount structure" whereby it "always" charges customers a price different from the list price. (Hr'g Tr. at 86.) The discount structure is confidential, Silipos argues, because competitors do not know the specifics (e.g., profit margins and product development information) that dictate how the discounted prices differ from the list prices. (Id.)

As an initial matter, the Court finds that Silipos has not met its burden to demonstrate that this information triggers the trade-secrets legitimate interest. See Marietta Corp., 754 N.Y.S.2d at 67 (holding that, in a restrictive-covenant case, pricing data is generally not considered a trade secret). Silipos's discount prices are not trade secrets because they are well known, as customers in this narrow industry liberally "talk about discounts of the different manufacturers with which they work" in order to negotiate the lowest prices. (Hr'g Tr. at 28.)

Likewise, information about the underlying mechanics of Silipos's discount pricing structure, such as profit margins, fails to rise to the level of trade secrets with respect to the restrictive covenant at issue. In economic terms, any seller's publicly-available prices signal to competitors some information about the underlying mechanics of the seller's pricing structure. Silipos is no different. Realistically, Silipos's concern is about the extent to which Bickel may divulge information about these underlying mechanics, over and above what competitors already know or could readily ascertain. Bickel's ability to do so is limited, however, because Bickel does not possess any documents that contain greater information about the underlying mechanics of Silipos's pricing structure. (Id. at 63-64.) Consequently, Bickel's knowledge in this area, though not trivial,

9

does not rise to the level of implicating the trade-secrets legitimate interest.

The Court thus finds that Silipos has failed to establish a trade-secrets legitimate interest with respect to the Non-Competition Covenant.[6]

### b. Protection of Confidential Customer Information

To establish particular information as confidential customer information, Silipos must demonstrate that the information is not known in the trade and is only discoverable through extraordinary efforts. See, e.g., Battenkill Veterinary Equine P.C. v. Cangelosi, 768 N.Y.S.2d 504, 507 (N.Y. App. Div. 2003) (denying a preliminary injunction because the plaintiff failed to demonstrate that its information was not publicly ascertainable). Silipos asserts that all of the information it claims as trade secrets also constitutes confidential customer information.

Not so. Pricing information is the only one of Silipos's asserted trade secrets that also relates to Silipos's customer relationships. See id. (describing confidential customer information to include materials such as customer lists). But Silipos has failed to demonstrate that its pricing information amounts to a trade-secrets legitimate interest precisely because that information is not sufficiently secret—it is publicly known to, or readily discoverable by, competitors. For the same reason,

---

[6] The Court limits its findings to the context of restrictive covenants. None of the findings constitute judgments on issues relating to Silipos's fourth cause of action (whether Bickel misappropriated trade secrets while at Silipos) (Compl. ¶¶ 43-50), and sixth cause of action (whether Bickel, while at Silipos, tortiously interfered with Silipos's business relationships) (id. ¶¶ 57-63). These findings are not dispositive with respect to those claims because the standards for finding trade secrets are, in practice, differently applied when handling a misappropriation of trade secrets claim. Compare Marietta Corp., 754 N.Y.S.2d at 64, 67 (finding that a former hotel executive, who set international pricing strategies, did not possess trade secrets in the context of restrictive covenants), with DoubleClick Inc. v. Henderson, No. 116914/97, 1997 WL 731413, at *4-5 (N.Y. Sup. Ct. Nov. 7, 1997) (finding proprietary pricing strategies in a "deal-driven" internet business to be trade secrets in the context of a misappropriation of trade secrets claim).

Silipos has failed to demonstrate that Bickel's knowledge of its pricing information encompasses confidential client information.

### c. Protection of Silipos's Client Base

Protection of customer relationships is a legitimate interest when "the employee must work closely with the client or customer over a long period of time, especially when his services are a significant part of the total transaction." BDO Seidman, 712 N.E.2d at 1224 (citation omitted). Over a fourteen-year period, Bickel had extensive, regular communications with many of Silipos's customers. From 1999 to 2005, Bickel personally visited many of these distributors twice a year, throughout the world. (Hr'g Tr. at 50.) Bickel nurtured these relationships by meeting distributors at podiatric-gel-industry trade shows throughout the United States. (Id. at 51-52.) In some cases, Bickel brought these customers to Silipos. In other cases, Bickel was Silipos's sole or primary contact with the customers. Through these relationships, Bickel negotiated discounted pricing arrangements central to Silipos's business. (See id. at 86.) Silipos shouldered all of the monetary expenses of these interactions. (Id. at 54.) Silipos, therefore, has demonstrated that Bickel's sales activities were significant enough to establish its legitimate interest in protecting a client base. See BDO Seidman, 712 N.E.2d at 1224.

### 2. Reasonableness in Time and Area

Review of the temporal and geographic reasonableness of restrictive covenants generally "focuses on the particular facts and circumstances giving context to the agreement." BDO Seidman, 712 N.E.2d at 1224. But New York courts routinely find one-year restrictions to be reasonable. See, e.g., Crown It Servs., Inc. v. Koval-Olsen, 782 N.Y.S.2d 708, 710 (N.Y. App. Div. 2004) (finding "no serious dispute" that a one-year limitation is reasonable). Likewise, the Court finds that

the one-year restriction in the Non-Competition Covenant is reasonable.

The geographic restriction in the Non-Competition Covenant, on the other hand, is not reasonable. New York courts rarely find worldwide restrictions reasonable in any context. See, e.g., Garfinkle v. Pfizer, Inc., 556 N.Y.S.2d 322, 323 (N.Y. App. Div. 1990) (summarily affirming the unreasonableness of a worldwide restriction). Silipos argues that the Non-Competition Covenant must extend worldwide because the scope of Silipos's business is worldwide. The podiatric-gel industry's customer base is intimate yet geographically diffuse; as a result, Silipos conducts business "all over North America, Mexico, Europe, Australia and the Asian Pacific countries." (Pl.'s Post-Hr'g Mem. at 12 (citing Hr'g Tr. at 72).)

Although the Court accepts this characterization of the podiatric-gel industry, it remains an insufficient basis for upholding the worldwide restriction in the Non-Competition Covenant. Indeed, the worldwide restriction is unreasonably broad in light of Silipos's lone legitimate interest—protection of its client base. To vindicate this interest, Silipos need only prevent Bickel from soliciting the particular clients for whom Bickel's services were a significant part of the overall transaction. See, e.g., Healthworld Corp. v. Gottlieb, 786 N.Y.S.2d 8 (N.Y. App. Div. 2004) (affirming a preliminary injunction limited only to a employer's customers with whom the former employee had contact). So long as Bickel does not solicit these clients, the geographic location of a potential employer is irrelevant.

Additionally, the Non-Competition Covenant is overbroad in two ways not directly related to geography. First, because the Non-Competition Covenant prohibits Bickel from working for anyone "directly or indirectly" engaged in the "Business of the Company," expansively defined, Bickel would be barred from the entire industry. (Pl.'s Post-Hr'g Mem. Ex. B2 (Section 2(a)); see

also Pl.'s Post-Hr'g Mem. Ex. B1 (defining the "Business of the Company" in Section 1(a)).) Second, the Covenant prohibits Bickel from performing functions over and above solicitation of clients. Under the restriction, Bickel cannot "directly or indirectly, engage in, or have any interest in any sole proprietorship, partnership, corporation, limited liability company or business or any other Person, whether as an employee, officer, director, partner, agent, lender, equity holder, consultant or otherwise." (Id. at 2 (Section 2(a)).) Because Silipos's legitimate interest extends only to protection of its client base, a covenant that forbids him from performing any function for any employer in the industry worldwide is overbroad.

### 3. Undue Burden to Employee and Harm to the Public

The third and fourth prongs of the BDO Seidman reasonableness test focus on whether enforcement of a restrictive covenant would be unduly burdensome to the employee or would cause harm to the public. With the exception of Bickel's contention that the Non-Competition Covenant would force him out of the entire industry for a year (Def.'s Br. at 1), neither party argues either of these prongs. Nonetheless, the Court does not find that the Non-Competition Covenant is unduly burdensome to Bickel, and does not find that it is harmful to the public.

### 4. Partial Enforcement

Whether a court may use its discretion to partially enforce an otherwise overbroad covenant involves a "case specific analysis, focusing on the conduct of the employer in imposing the terms of the agreement." BDO Seidman, 712 N.E.2d at 1226. While the Court finds that Silipos has demonstrated good faith—a prerequisite to partial enforcement—the Court will not partially enforce the Non-Competition Covenant in this case due to the presence of the Non-Solicitation Covenant. Whereas the Non-Competition Covenant indiscriminately bars Bickel from performing any function

for any employer in the industry, the Non-Solicitation Covenant only prohibits Bickel from soliciting Silipos's current and prospective customers for one year. Because Silipos's legitimate interests extend only to protecting against solicitation of particular customers, the Non-Solicitation Covenant is more appropriately tailored to address those interests. The Court thus declines to enforce the Non-Competition Covenant in whole or in part.

### B. The Non-Solicitation Covenant

#### 1. Reasonableness Under BDO Seidman

With one exception, all of the Court's factual findings and legal conclusions regarding the Non-Competition Covenant apply with equal force to the Non-Solicitation Covenant. The Court finds, however, that the Non-Solicitation Covenant, which has no explicit geographic limitation, does not cover an unreasonably broad geographic area. In light of the gel industry's intimate yet geographically diffuse nature, Silipos's legitimate interests in protecting its customer base extend worldwide. But the Court will only partially enforce the Non-Solicitation Covenant because Silipos's legitimate interests do not extend to all of its current or prospective customers.

#### 2. Partial Enforcement

A court's discretion to partially enforce an otherwise overbroad covenant requires that the employer first demonstrate good faith—"an absence of overreaching, coercive use of dominant bargaining power, or other anti-competitive misconduct." BDO Seidman, 712 N.E.2d at 1226. The Court finds that Silipos has demonstrated good faith. Bickel acknowledges freely assenting to the 1999 Agreements (Hr'g Tr. at 40), and does not allege bad faith in contract negotiations. In exchange for entering into the 1999 Agreements, Bickel also received an annual pay increase from $140,000 to $200,000. (Id. at 39.) Furthermore, Silipos did not unreasonably believe that it had or

might have legitimate interests in protecting trade secrets and confidential customer information. Accordingly, the Court maintains discretion to partially enforce the Non-Solicitation Covenant.

Although Silipos has a legitimate interest in protecting its customer base worldwide, its interest does not warrant restricting Bickel's ability to solicit Silipos's entire customer base. See Portware v. Barot, No. 603738/05, slip op. at 5 (N.Y. Sup. Ct. Mar. 2, 2006) (denying a preliminary injunction only with respect to customers with whom the employee had not developed a relationship while at the company); see also Johnson Controls, Inc. v. A.P.T. Critical Sys., Inc., 323 F. Supp. 2d 525, 536 (S.D.N.Y. 2004) (refusing to enjoin the employee from soliciting a customer with whom he "independently" developed a relationship); Healthworld, 786 N.Y.S.2d at 8 (affirming a preliminary injunction covering only a subset of the employer's customers). In light of Bickel's varying degrees of contact with Silipos's forty-five customers, the Court will only enforce the Non-Solicitation Covenant against Bickel where he "work[ed] closely with the client or customer over a long period of time, especially when his services [we]re a significant part of the total transaction." See BDO Seidman, 712 N.E.2d at 1224.

Bickel's customer relationships that satisfy the BDO Seidman standard fall roughly into three categories. The first category includes customers that Bickel brought to Silipos. Bickel brought Cascade Orthopedics, North Coast, Aetrex, and ProMed to Silipos. (Hr'g Tr. at 21.) The second category includes customers for whom Bickel was the primary contact. Bickel acknowledges being the primary contact for Bunheads, Pedifix, and Benchmark Brands. (Id. at 55-56, 74.) Bunheads and Pedifix are two of Silipos's largest customers (id. at 82), and represent nine percent and "roughly 4 or 5" percent, respectively, of Silipos's 2005 revenues (id. at 103). After Bickel left Silipos, revenue generated from these two companies decreased from approximately $700,000 in

15

the first quarter of 2005 to less than $100,000 in the first quarter of 2006. (Id. at 83.) The Court also finds that Bickel was the primary contact for Southern Prosthetic Supply. (Id. at 74.) The final category includes customers with whom Bickel had a substantial degree of long-term involvement. Bickel acknowledges creating and maintaining personal relationships with representatives of Southern Prosthetic Supply, Knit-Rite, Pel Supply, and Kingsley. (Id. at 53-54.) The Court also finds that Bickel had a substantial degree of long-term involvement with Silipos Canada[7] (id. at 56), Universal Foot Care (id. at 75), and Moore Medical (id.).

Bickel worked closely with the companies named above over long periods of time, and he often facilitated negotiations of individualized discount prices that constitute a significant part of the overall transactions between Silipos and its customers. The Court therefore holds that the Non-Solicitation Covenant is enforceable only with respect to these companies.[8]

### 3. Implied Permanent Covenant

Silipos devotes much effort to arguing that sale-of-business contracts carry "implied covenants," which prohibit the seller from soliciting former customers for an "indefinite duration." (See Pl.'s Post-Hr'g Mem. at 8-10; see also Pl.'s Post-Hr'g Reply at 1-2.) Silipos argues that Bickel, in essence a seller of the company, should likewise be barred from soliciting customers indefinitely. This argument is unavailing. Bickel's case is easily distinguishable insofar as "[t]he parties hav[e]

---

[7] Silipos Canada is separate distributorship that Silipos does not own. (Hr'g Tr. 56.)

[8] In Section 2(b)(i) of the Non-Solicitation Covenant, Bickel is also putatively barred from soliciting Silipos's current and former employees. (See Pl.'s Post-Hr'g Mem. Ex. B3.) At no point has either party discussed the merits of restricting Bickel's solicitation of Silipos's employees. Therefore, the Court's ruling does not constitute a judgment on whether this particular subsection of the Non-Solicitation Covenant is enforceable, in whole or in part.

16

. . . negotiated and expressly defined the reach of the limitation on solicitation" in the Non-Solicitation Covenant. See MGM Court Reporting Serv., Inc. v. Greenberg, 541 N.E.2d 405, 406 (N.Y. 1989). Accordingly, "a more general limitation may not be implied." Id. Because the Non-Solicitation Covenant carries an explicit one-year restriction, no implied covenant of indefinite duration exists between the parties.

## III. CONCLUSION

For the foregoing reasons, and because there is no evidence in the record to suggest that Bickel has violated the terms of the Non-Competition Covenant or the Non-Solicitation Covenant since termination of his employment, the Court declines to enforce the Non-Competition Covenant but declares that the Non-Solicitation Covenant is partially enforceable. Bickel is hereby enjoined, through January 11, 2007, from soliciting the following current or prospective customers of Silipos: Cascade Orthopedics, North Coast, Aetrex, ProMed, Bunheads, Pedfix, Benchmark Brands, Southern Prosthetic Supply, Knit-Rite, Pel Supply, Kingsley, Silipos Canada, Universal Foot Care, and Moore Medical. The Non-Solicitation Covenant is void as to all of Silipos's other current or prospective customers.

**So Ordered:** New York, New York
August 8, 2006

*[signature]*

Richard Conway Casey, U.S.D.J.