USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 10/15/07 TS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
SILIPOS, INC.,
                Plaintiff,

    - against -

PETER D. BICKEL,
                Defendant.
------------------------------------x

06 Civ. 2205 (DFE)
This is an ECF case
OPINION AND ORDER

DOUGLAS F. EATON, United States Magistrate Judge.

    Following discovery, each side has moved for summary judgment. On June 29, 2007, Silipos's notice of motion annexed Hudkins Exhibits A through O, and Susman Exhibits A through C. On July 30, Bickel's cross-motion annexed Bickel Exhibits A through X, many of which were duplicates of his adversary's exhibits. On August 20, Silipos served its second memorandum of law. On September 10, Bickel served his second memorandum of law.

    Peter D. Bickel graduated from college in 1988. In 1992, he started working for Silipos, Inc., a company founded three years earlier by his father, who owned about 65% of the stock. Around 1996, the father and the two other shareholders arranged for the son to receive 20% of the stock. In August 1999, the four men sold Silipos to an English company named SSL Holdings Inc.; Peter Bickel received a capital gain of approximately $4.5 million. Unlike his father, Bickel stayed on with Silipos, working in Manhattan as Executive Vice President in charge of sales. His salary was increased from about $140,000 to $200,000. (4/21/06 Bickel Depo. Tr. 6-26; 2/16/07 Bickel Depo. Tr. 30-34.) He and Silipos signed two contracts, both dated August 20, 1999: an Employment Agreement (Hudkins Exh. A) and a Noncompetition, Nonsolicitation and Confidentiality Agreement (Hudkins Exh. B).

    In 2000, Bickel's father acquired the majority of shares of Polygel. Polygel and its affiliates Gel Concepts and Gel Smart are headquartered in New Jersey. They sell orthopedic gel products and skin care products, as does Silipos. (2/16/07 Bickel Depo. Tr. 8-9, 13-15, 21-25, 199-201; Bickel Exh. E.)

    In 2004, SSL Holdings, Inc. sold Silipos for $16.5 million to Langer, Inc., a Delaware corporation with headquarters in Deer Park on Long Island. (6/28/07 Hudkins aff. ¶7.) Bickel stayed on as Executive Vice President working in Manhattan with the

-1-



sales staff. His salary was increased from $200,000 to $250,000. (4/21/06 Bickel Depo. Tr. 26-33.) He began reporting to Gray Hudkins, the Chief Executive Officer of Silipos and a top officer of the parent company Langer.

In the fall of 2005, four employees, each of whom had been working with Bickel for more than three years, complained about him to Hudkins, whose office was in Deer Park. Eventually, at Hudkins's request, they signed affidavits containing their allegations. These four affidavits are collected at Hudkins Exh. D, and I will quote a few portions:

> 12/21/05 affidavit by the Director of Sales:
> "9. Mr. Bickel also told me repeatedly that Langer was planning to close the Manhattan office and that I would have to work out of the Deer Park office (I live in New Jersey, and he knew a commute to Deer Park would be impossible for me.) I subsequently learned from Mr. Hudkins that Langer never planned to close the Manhattan office and [he] even offered to show me the new lease for the Manhattan office."

> 12/21/05 affidavit by the Northeast Regional Manager:
> "7. In or about February 2005, Mr. Bickel told me that Langer would not be able to meet the note to buy Silipos from SSL and that his father would be buying back the company."

> 1/5/06 affidavit by Bickel's office manager and assistant: "12. Following a trade show at the Jacob Javits Center in New York City in early 2005, which was attended by representatives of the skincare division of the Company, I believe that Peter forwarded a sheet of sales leads to his father. .... I went to the mailroom ..., and he was there also, with an envelope addressed to Peter's father, which he was trying to mail himself. The envelope was not sealed because the contents were improperly stuffed into the envelope. I removed the materials from that envelope to straighten them up .... The materials I saw when I removed them include a sheet of sales leads that Peter obtained at the trade show."   * * *   "4. Shortly before Thanksgiving, 2005, Peter stated that he was leaving the Company ...."

> 1/5/06 affidavit by the Director of Skin Care:
> "4. This past summer we both attended the Cosmoprof North America trade show held in Las Vegas, Nevada.

-2-

We had previously been introduced to the President
of a company called Dermanew, ... with which we
wanted to establish a business relationship. ....
I observed Peter Bickel speaking with the President
of Dermanew at their trade booth. The President of
Dermanew remarked to Peter that he had met with
Peter's father's company regarding hydrogel technology,
that he was definitely interested and would want to
meet again. Peter's father, Joel Bickel, operates
a competing business, and it was apparent to me that
Peter had engaged the President of Dermanew in
business discussions to assist his father's business
at the expense of Silipos."

Bickel's Employment Agreement (Hudkins Exh. A, same as
Bickel Exh. W) includes the following:

1. <u>Interpretation of this Agreement</u>.

(a) <u>Terms Defined</u>. * * * "<u>Cause</u>" means any of
the following: * * * (c) the Employee's wilful or
intentional wrongful act or omission in the performance
of his duties under this Agreement that, in the Board's
reasonable judgment, has or could have a material
adverse effect on the Company's ... reputation,
business, properties or interests; ....

* * *

2. <u>Employment</u>.

(a) <u>Duration</u>. This Agreement may be terminated
with or without Cause by either party at any time.
Upon the terms of and subject to the conditions set
forth in this Agreement, the Company will employ the
Employee and the Employee will remain an employee of
the Company, for the period beginning on the date of
this Agreement and ending upon the first to occur of
(i) notice of termination, (ii) the Employee's
voluntary resignation, (iii) the date on which the
Employee's employment is terminated for Cause, (iv)
the date on which the Board elects to terminate the
Employee's employment without Cause ..., (v) the
Employee's death, and (vi) the Employee's Disability
(the "<u>Employment Period</u>"). Except in the case of
death, resignation, or termination for Cause,
termination will not be effective until 30 days
after the Board has given written notice to the

-3-

>   Employee of such termination; provided, that the
>   Company shall have the right to remove the Employee
>   from the position then held and the offices of the
>   Company, and to pay in lieu of such notice his
>   Base Salary for such one (1) month period. Termination
>   for Cause will be effective on the date set forth in
>   a written notice given to the Employee by the Board
>   in connection with such termination. The Employee
>   agrees to give the Board at least 60 days prior
>   written notice of his resignation.

\* \* \*

>   4. <u>Severance Pay</u>. In the event that the Employee's
>   employment is terminated by the Board without Cause ...,
>   the Company will pay to the Employee all amounts due
>   to the Employee as Base Salary ... for a period of
>   two (2) years .... [i.e., a $500,000 Severance Benefit]

\* \* \*

>   7. <u>Notices</u>. All notices, requests, demands, waivers
>   and other communications required or permitted under
>   this Agreement shall be in writing and shall be hand
>   delivered or sent by registered or certified mail,
>   postage prepaid, or by telecopier or recognized
>   overnight courier, to the intended recipient ....

As set forth in detailed minutes by Director, Secretary and CFO Joseph Ciavarella (Bickel Exh. T), the three members of the Silipos Board (CEO Hudkins, Ciavarella, and Andrew Meyers) held a special meeting of the Board on January 11, 2006, commencing at 10:30 a.m., heard Hudkins describe an investigation by him and counsel concerning Bickel's conduct, and decided:

>   ... After further extensive discussion,
>   on motion duly made and seconded, the following
>   resolutions were unanimously adopted:
>
>   Resolved, that the Board of Directors has
>   determined that Mr. Peter Bickel is in material
>   breach of certain provisions of his employment
>   agreement with the Company dated as of August 20,
>   1999 (the "Employment Agreement"), and that Mr.
>   Bickel has committed willful or intentional
>   wrongful acts or omissions in the performance of
>   his duties under his Employment which could have
>   a material adverse effect upon the Company; and

it is further

    Resolved, that the Chief Executive Officer of
the Company if hereby authorized, in his discretion,
to terminate the Employment Agreement for Cause as
defined in the Employment Agreement; *provided, however,*
that the Chief Executive Officer, in his discretion,
may seek the voluntary resignation of Mr. Bickel, and
make a settlement with Mr. Bickel on such terms as the
Chief Executive Officer deems appropriate; ....

Also on January 11, 2006, at approximately 5:15 p.m., Bickel was called to Hudkins's office in Deer Park and met with Hudkins and with Kathryn Kehoe, a human resources consultant for Langer. (6/28/07 Hudkins aff. ¶39.) All three persons have given depositions about that meeting. Bickel's 2/16/07 testimony includes the following:

    Q. And did Gray [Hudkins] ask you if you were planning on leaving the company?
    A. No. [Tr. 172.]

    \* \* \*

    Q. And you didn't tell him that you had recently completed a real estate program, did that come up in the meeting at all?
    A. People knew that I was taking a real estate program. Whether Gray knew that or whether other people in the office knew that, I had taken a real estate program on the weekends, yes. [Tr. 172.]

    \* \* \*

    Q. What did he say in that regard?
    A. That he had sworn affidavits from employees in the company who said I had said disparaging comments about the company.
    Q. Did you react to that at all?
    A. I got very emotional.
    Q. Did you say that's not true?
    A. I just became very emotional at that time.
    Q. So you didn't speak at all in response to that?
    A. No. [Tr. 173.]

    \* \* \*

>   Q. Did he tell you if you didn't resign, that you would be terminated for cause?
>   A. That's what he had told me. I remember him saying that, yes.
>   Q. You recall him saying that if you did not voluntarily resign you were going to be terminated for cause? Do you recall that happening?
>   A. That I remember.
>   Q. Okay. Did you tell him that you would rather resign and go out with dignity rather than be terminated for cause?
>   A. I was very emotional and I said I want to, my words were I want to leave with dignity and then I became emotional and that's what I said. [Tr. 174.]
>
>      * * *
>
>   Q. Okay. Did he tell you that if you chose to resign you would be paid for the 60-day notice period under your employment contract, do you recall that?
>   A. I think he had mentioned something along those lines. [Tr. 176.]
>
>      * * *
>
>   Q. And during the course of the meeting did Gray tell you that he would send out a company communication regarding your resignation?
>   A. He did.
>   Q. Did he use the word resignation?
>   A. That I don't recall.
>   Q. And did he tell you that he would fax you a copy of the resignation announcement for you to review?
>   A. He said that there would be an announcement sent to me by fax, .... [Tr. 177.]

Five hours later, at 10:39 p.m., Hudkins faxed to Bickel's home a one-page proposed announcement bearing the next day's date. The fax confirmation sheet and the announcement are now Hudkins Exh. J; they were marked at Bickel's deposition as PX-7 and PX-6. The proposed announcement was addressed to "All Employees" from Gray Hudkins and said:

>   After a thirteen year career with Silipos, Peter Bickel has informed me of his desire to resign as Executive Vice President of the Company to pursue other interests and we have accepted his resignation. Peter intends to pursue a career in

> real estate investing and development, something
> he has done personally for some time and enjoyed.
>
> Peter made many contributions over his 13 year
> tenure with the Company, ....
>
> Peter has agreed to stay with the company for
> a 60 day period during which he will work from home
> ....
>
> Please join me in thanking Peter for his many
> contributions over the years and wishing Peter much
> success in his new career.

Bickel received this document; by the morning of January 12, he had read it. When Hudkins telephoned him on January 12, he had already read it, and he voiced no objection concerning it. (2/16/07 Bickel Depo. Tr. 179-84.) At Tr. 181, Bickel testified that he inwardly objected to one aspect of the announcement, namely the part about "resignation." When asked why he didn't communicate this to Hudkins, his answer was: "I wanted it to be handled through my attorneys." (Tr. 182.) Within 48 hours, Bickel had spoken to two law firms: "I spoke originally to the people at Nowell, Klein, Amoroso who were involved in the renewal of the contract negotiation [in 2004], and then I decided to go to Mandelbaum Sal[s]burg." (Tr. 166-67.) However, the proposed announcement had been sent to him by fax in compliance with Section 7 of the Employment Agreement. If he had an objection, Section 7 required him to respond in writing, whether in person or through an attorney. Speed was required since he knew that Hudkins planned to send the announcement to "All Employees" on January 12.

When Hudkins telephoned Bickel on January 12, he notified him that another memo was on its way, with a release and a severance that was going to be provided by the company. Bickel replied, "send it and I'll take a look at it." (Tr. 184-86.) This second document (in the form of a letter to him from Hudkins) was faxed to him on January 13; he provided both documents to his attorney. (Tr. 187.) Presumably, he also provided his own memo of the January 11 meeting, which confirmed that Hudkins had told him that he could either resign or be terminated for cause. (Tr. 188-91, describing PX 9.)

The January 13 letter from Hudkins contained five paragraphs. The first paragraph said:

> This will confirm that Silipos, Inc., a

-7-

> Delaware corporation (the "Company") has accepted your resignation, which you tendered to me on January 11, 2006, effective as of March 12, 2006 (such date, the "Termination Date"), at which time your employment shall terminate. ... [T]he Company shall continue to pay you your regular salary through March 12, 2006, ....

The second paragraph gave Bickel written notice about details that may or may not have been stated at the January 11 meeting, including "you shall not have any contact with any employee, customer, vendor or other person having a business relationship with the Company, other than [Hudkins] or Mr. Joseph P. Ciavarella ...."

The third paragraph gave Bickel written notice of the Company's position that Bickel was still required by the terms of his two 1999 contracts to comply with his obligations of confidentiality, nonsolicitation and noncompetition.

The fourth paragraph said: "By [counter]signing this letter, you agree to release the Company ... from any and all claims ..., and you confirm to the Company that you have had the opportunity to consult with legal counsel ...."

The final paragraph said: "Please confirm your agreement with all of the foregoing by countersigning a copy of this letter returning it to me by fax or e-mail."

Like the proposed announcement to "All Employees," Hudkins's January 13 letter had been sent to Bickel by fax in compliance with Section 7 of the Employment Agreement. If Bickel had an objection, Section 7 required him to respond in writing, whether in person or through an attorney. However, there was no written response until February 13. Meanwhile, the Company followed through on its promise to pay Bickel's salary for two months. During the four weeks after January 11, the Company sent four paychecks; Bickel endorsed and deposited each one (he was not paid via direct deposit). (2/16/07 Bickel Depo. Tr. 209-10.)

On February 13, 2006, Bickel's attorney (Mark F. Kluger of Mandelbaum Salsburg) sent a short letter to Hudkins via Federal Express:

> This firm represents Peter D. Bickel in regard to his recent separation from Silipos, Inc. ("Silipos"). Contrary to the assertions in your January 13, 2006 letter to Mr. Bickel and the misrepresentation in your

-8-

January 12, 2006 Interoffice Memorandum to "All Employees," Mr. Bickel did not resign from Silipos, as you well know. When you met with him on January 12 [11], 2006, you gave Mr. Bickel the option to be terminated or resign. As you know, he did not respond to your demands.

Your efforts to avoid the company's obligations to pay Mr. Bickel severance pursuant to his 1999 employment agreement (the "Agreement") are transparent at best. Paragraph 4 of the Agreement entitles Mr. Bickel to the Severance Benefit of two years of his base salary from the date of his termination.

We will not engage in a debate in which you seek to convince us that the company terminated Mr. Bickel "for cause." We know this is not the case. Instead, we seek only that to which Mr. Bickel is entitled under the Agreement. If you are inclined to resolve this matter amicably, kindly redraft your January 13, 2006 letter to incorporate payment of two years of his base pay and a release and send it to me within five (5) days of the date of this letter.

(Bickel Exh. V.)

On February 23, 2006, Silipos filed suit against Bickel in Supreme Court, New York County. Among other things, Silipos sought a "judgment declaring that defendant resigned from his position at plaintiff ..., or in the alternative, judgment declaring that defendant was terminated for cause ...." (Docket Item #1, Exh. A, p. 14.) On March 21, 2006, Bickel removed the lawsuit to our Court on the basis of his New Jersey citizenship. On the same date, he moved, by order to show cause, to enjoin Silipos from enforcing the one-year non-competition and non-solicitation covenants that he had signed in 1999; that aspect of the case was given an accelerated trial on the merits by Judge Richard C. Casey, who issued a decision on August 8, 2006. He declined to enforce the non-competition covenant; on the other hand, he enjoined Bickel, through January 11, 2007, from soliciting 14 specified current or prospective customers of Silipos. *Silipos, Inc. v. Bickel*, 2006 WL 2265055 *9 (S.D.N.Y. Aug. 8, 2006).

Four weeks later, in September 2006, Bickel commenced employment at his father's company Polygel, at a salary of $100,000 as vice-president of sales and marketing. (2/16/07 Bickel Depo. Tr. 8-9, 19-23.)

-9-

In the Employment Agreement, Section 2(a), the last sentence says: "The Employee agrees to give the Board at least 60 days prior written notice of his resignation." If the Employee gives written notice that he will stop working in less than 60 days, or if he gives oral notice but refuses to put it in writing, the Company could sue him for damages, for example by alleging that its ability to find a replacement was hindered by short notice or by uncertainty created by a refusal to put an oral resignation in writing. But Section 2(a) does not say that an oral resignation is a nullity.

Subsection 2(a)(ii) speaks only of "the Employee's voluntary resignation," and it doesn't say "the Employee's voluntary resignation written by the Employee." If the Employee orally chooses resignation, but fails to put this in writing, the Company is not thrown into "checkmate," nor is a lawsuit its only remedy. All it must do is to follow Section 7 and to send a written notice of its understanding.

Bickel's testimony concedes the following. On January 11, 2006, he was told by Hudkins "[t]hat he had sworn affidavits from employees in the company who said I had said disparaging comments about the company." Bickel did not speak at all in response to that. (Tr. 173.) Hudkins said, "[I]f you d[o] not voluntarily resign you [a]re going to be terminated for cause." Bickel said, "I want to leave with dignity." (Tr. 174.) Hudkins said, in substance, "if you cho[o]se to resign you would be paid for the 60-day notice period under your employment contract." (Tr. 176.) Five hours later, Hudkins faxed Bickel the proposed announcement addressed to "All Employees" from Hudkins, which said: "... Peter Bickel has informed me of his desire to resign ... and we have accepted his resignation." Bickel read this, and he voiced no objection to it when Hudkins spoke with him by telephone on January 12. (Tr. 179-84.) It is undisputed that Hudkins then sent the announcement to all of the company's employees.

On January 13, Hudkins faxed a second document to Bickel, the five-paragraph letter which mentioned "the opportunity to consult with legal counsel" and asked Bickel to return a countersigned copy to "confirm your agreement with all of the foregoing." Within 48 hours, Bickel discussed both documents with two law firms, and specifically with Mark F. Kluger. (Tr. 166-67.) Until February 13, Bickel and his attorneys failed to give any response that complied with Section 7 of the Employment Agreement. Bickel now seems to argue that this failure signaled that he was not confirming the first paragraph, which said that (a) the Company "has accepted your resignation, which you

-10-

tendered to me on January 11, 2006," and (b) "the Company shall continue to pay you your regular salary through March 12, 2006." However, he endorsed and deposited the next four paychecks. (Tr. 209-10.) Bickel's month-long failure to give a written response signaled only that he was not agreeing with the portions of the January 13 letter that discussed topics which the letter did not say had been resolved at the January 11 meeting. One such topic was the Company's position that Bickel was still required by the terms of his two 1999 contracts to comply with obligations of confidentiality, nonsolicitation and noncompetition.

Bickel belatedly presents me with two additional arguments in his second memorandum. (Bickel's 9/10/07 Reply Memo., p. 2.) First, he asserts:

> Bickel's statement ["I want to leave with dignity"] was not a written resignation, and the employment agreement expressly states that any waiver or modification of the agreement must be in a signed writing. See (Employment Agreement, Exhibit W, ¶15); General Obligations Law §15-301.

But Bickel's statement was in no way a "waiver" or "modification" of the Employment Agreement that he signed in 1999. Second, he asserts:

> ... The statement ["I want to leave with dignity"] is, essentially, part of a settlement discussion that never reached fruition as a formal, written agreement.

On the morning of January 11, the Board resolution authorized Hudkins "to terminate the Employment Agreement for Cause," and/or to "seek the voluntary resignation of Mr. Bickel," and/or to "make a settlement with Mr. Bickel." (Bickel Exh. T.) Later on the same day, Hudkins and Bickel reached a settlement on two main points: Bickel resigned, and Silipos promised to pay him for 60 more days. This is clear from Bickel's own testimony. Hudkins said that "he had sworn affidavits from employees in the company who said I had said disparaging comments about the company," and "if you d[o] not voluntarily resign you [a]re going to be terminated for cause." Bickel replied, "I want to leave with dignity." (Tr. 173-74.) Hudkins said, in substance, "if you cho[o]se to resign you would be paid for the 60-day notice period." (Tr. 176.) Hudkins soon confirmed in writing (first to Bickel, and then to "All Employees") that "Peter Bickel has informed me of his desire to resign ... and we have accepted his resignation. ... Peter has agreed to stay with the company for a

-11-

60 day period during which he will work from home ...." On January 13, Hudkins confirmed in writing that "the Company shall continue to pay you your regular salary through March 12, 2006." This would have been gross pay of more than $40,000. Bickel proceeded to endorse and deposit his paychecks in each of the next four weeks. All of this complied with Bickel's expressed desire "to leave with dignity" rather than to fight a termination for cause.

On the basis of Bickel's own testimony, any rational jury would find that Silipos has proven that Bickel resigned.

The next question is whether his resignation was voluntary. The parties agree that this diversity case is governed by New York law. The Appellate Division recently wrote:

> Petitioner is not entitled to a trial pursuant to CPLR 7804(h) on the issue of whether his departure from the New York City Employees' Retirement System was coerced. Even accepting his version of the facts (i.e., that respondent Stark had told him he would be fired if he did not retire), petitioner's retirement would not be deemed involuntary.

*Murphy v. City of New York*, 35 A.D.3d 319, 827 N.Y.S.2d 46 (1st Dep't 2006), citing *Matter of DeMarco v. McLaughlin*, 49 N.Y.2d 941, 428 N.Y.S.2d 624 (1980), *affirming* 69 A.D.2d 882, 415 N.Y.S.2d 1008 (2d Dep't 1979).

Bickel relies heavily on *Bensen v. American Ultramar Ltd.*, 1997 WL 66780, *10 (S.D.N.Y. Feb. 14, 1997), where Judge Buchwald wrote:

> . . . We recognize that [r]esignation is ordinarily a voluntary act, and the fact that plaintiff was threatened with discharge does not constitute such duress as to render the resignation involuntary. *Levitz v. Robbins Music Corp.*, 6 A.D.2d 1027, 1027, 178 N.Y.S.2d 221, 222 (1st Dep't 1958). However, whether a purported voluntary resignation is in fact a forced discharge is an issue of fact. *Id.*, 6 A.D.2d at 1027-28, 178 N.Y.S.2d at 222. Appearances can be deceiving and a purported voluntary resignation may actually be an employer discharge. *Sarle v. Sperry Gyroscope Co., Division of Sperry Rand Corp.*, 4 A.D.2d 638, 641, 168 N.Y.S.2d 228, 231 (1st Dep't 1957), *aff'd*, 4 N.Y.2d 917, 174 N.Y.S.2d 665 (1958). ... *I. Edward Brown, Inc.*

-12-

> v. *Astor Supply Co.*, 4 A.D.2d 177, 179, 164 N.Y.S.2d
> 107, 108-09 (1st Dep't 1957) (finding a forced
> resignation where employee had no real alternative),
> . . . .

However, in *Bensen* the Employer never alleged that Bensen did anything wrong. His resignation (and the cessation of his high salary) was suggested by the Employer's law firm as "one of the defense tactics" to help the Employer defend against an unwelcome tender offer. *Bensen*, at *3. Informed that he would be fired if he did not resign, Bensen wrote: "My resignation as director of the Companies shall be without prejudice to any claim or claims which I may have against any of the Companies arising out of my service Agreement ...." *Id.* at *4.

Similarly, in *I. Edward Brown, Inc.*, the Employer did not allege that the employee Cohen did anything wrong. The plaintiff Employer had made "an apparently inequitable ruling ... as to Cohen's right to approach dormant accounts formerly handled by other of plaintiff's salesmen. Plaintiff's president had the last word. He told Cohen that if he did not like the ruling, inconsistent though it might be, he could leave. Cohen left." 4 A.D.2d at 178, 164 N.Y.S.2d at 108. There was no indication that Cohen actually did approach the dormant accounts, let alone that he disobeyed the ruling. Those facts led three judges to rule that the president's words amounted to a discharge without cause, and hence the employer could not enforce a covenant not to compete. Two dissenting justices agreed with the trial judge that Cohen voluntarily resigned. In any event, Cohen's special facts are not present in our case. Bickel concedes that Hudkins collected sworn affidavits, obtained a Board resolution, accused Bickel of wrongdoing, and said, "[I]f you d[o] not voluntarily resign you [a]re going to be terminated for cause." Bickel replied, "I **want** to leave with dignity." (Tr. 173-74, emphasis added.)

*Sarle* is also off-point. That decision enforced a broad arbitration clause and explained: "Whether the purportedly voluntary resignation is a voidable act or not involves a determination whether the collective bargaining agreement was violated or not. It is undisputed that the general collective bargaining agreement, *qua* agreement, remains unaffected by any act of either of the two employees." 4 A.D.2d at 640, 168 N.Y.S.2d at 230.

Bickel has shown no evidence to take him out of New York's general rule that "the fact that [the employee] was threatened with discharge does not constitute such duress as to render the

-13-

resignation involuntary." Bickel was a sophisticated executive who consulted lawyers within 48 hours. After waiting for a month, his attorney finally wrote a letter; even then, the letter said: "We will not engage in a debate in which you seek to convince us that the company terminated Mr. Bickel 'for cause.'" (Bickel Exh. V.) In other words, after consulting with his lawyer for one month, Bickel still chose not to ask Silipos for a hearing or reconsideration on the issue of "cause," i.e., whether he had committed a "wilful or intentional wrongful act or omission in the performance of his duties under this Agreement that, in the Board's reasonable judgment, has or could have a material adverse effect on the Company's ... reputation, business, properties or interests." (Bickel Exh. W, Section 1(a)'s definition of "Cause.")

On the basis of Bickel's own testimony, any rational jury would find that Bickel's resignation was voluntary.

Silipos's February 2007 Complaint seeks "on the First Cause of Action, judgment declaring that defendant resigned from his position ... or in the alternative, judgment declaring that defendant was terminated for cause ...." (Docket Item #1, Exh. A, p. 14.) I hereby grant summary judgment declaring that Bickel voluntarily resigned from Silipos prior to the filing of the Complaint. Accordingly, the request for the alternative declaration is moot. I also grant summary judgment dismissing Bickel's counterclaim to the extent it alleges that he was terminated without cause and that he is entitled to $500,000.

The Third Cause of Action alleges breach of fiduciary duty and the Fifth Cause of Action invokes the faithless servant doctrine. Silipos's June 2007 motion also asks me to grant summary judgment on those two causes of action, and to require Bickel "to forfeit the amount of approximately $291,667.00, representing 14 months of salary." (Silipos 6/29/07 Memo., p. 19.) On the other hand, Bickel's cross-motion asks me to grant summary judgment dismissing those two causes of action. (Bickel 7/30/07 Memo., pp. 1, 21-25.) I hereby deny summary judgment to both sides on the Third and Fifth Causes of Action. I note that these causes of action would be difficult to prove. A claim for breach of fiduciary duty "requires a showing of actual damages." *Sanders v. Madison Square Garden, L.P.*, 2007 WL 1933933, *4 (S.D.N.Y. July 2, 2007) (Lynch, J.). "To show a violation of the faithless servant doctrine, an employer must show (1) that the employee's disloyal activity was related to the performance of his duties, and (2) that the disloyalty permeated the employee's service in its most material and substantial part." *Id.* at *3 (citations and internal quotation marks omitted).

-14-

If Silipos still wishes to pursue either or both of the Third and Fifth Causes of Action, then Bickel may require Silipos to produce the four employees who signed the affidavits (Hudkins Exh. D) for additional depositions of up to two hours each, at Bickel's expense. See my previous Memorandum and Order, *Silipos, Inc. v. Bickel*, 2007 WL 2254345 (S.D.N.Y. Aug. 2, 2007).

                               *[signature]*
                               DOUGLAS F. EATON
                               United States Magistrate Judge
                               500 Pearl Street, Room 1360
                               New York, New York 10007
                               Telephone: (212) 805-6175
                               Fax: (212) 805-6181

Dated:     New York, New York
             October 12, 2007

Copies of this Opinion and Order are being sent by fax and by electronic filing to:

Jeffrey H. Daichman, Esq.
Dana M. Susman, Esq.
    Kane Kessler, P.C.
(also by fax to 212-245-3009)

David S. Ratner, Esq.
Rory I. Lancman, Esq.
    Morelli Ratner PC
(also by fax to 212-751-0046)